In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-3146

MARK H. WILLIAMS,

*Plaintiff-Appellant*,

*v.*

THE INTERPUBLIC SEVERANCE PAY PLAN and
THE MANAGEMENT HUMAN RESOURCES COMMITTEE,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 703—**James B. Zagel**, *Judge*.

———————

ARGUED APRIL 2, 2008—DECIDED APRIL 29, 2008

———————

Before EASTERBROOK, *Chief Judge*, and BAUER and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  A golden-parachute clause in a severance plan offers executives benefits if they resign following a change of control, unless the new owner offers the executive a "comparable" position at the same salary or higher. Mark Williams, paid $167,000 as "Senior Vice President, Account Management and Development" at the Chicago office of Campbell Mithun, an advertising agency, was offered a position as "Senior

Vice President, Account Management" at a salary of $169,000 after GreenHouse Communications bought Campbell Mithun's Chicago office. Williams spurned the offer, quit, and demanded benefits from the Interpublic Severance Pay Plan. (The Interpublic Group is Campbell Mithun's parent.) The Plan turned him down, and the district court granted summary judgment in its favor in this suit under the Employee Retirement Income Security Act (ERISA). 2007 U.S. Dist. LEXIS 57368 (N.D. Ill. Aug. 7, 2008).

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), holds that judicial review of a plan's decision is non-deferential unless the plan's own provisions explicitly hand interpretive authority to its administrator rather than the judiciary. This Plan authorizes its administrator "to interpret the Plan, make findings of fact, and . . . decide any and all matters arising hereunder, including the right to remedy possible ambiguities, inconsistencies or omissions". A broader grant of discretionary authority is hard to imagine. Language such as this requires deferential judicial review. See *Diaz v. Prudential Insurance Co.*, 424 F.3d 635 (7th Cir. 2005).

Williams contends nonetheless that we should review the decision *de novo* because the Plan is unfunded. Any decision in an employee's favor comes from Interpublic's assets and, as a result, the administrator (which usually can be replaced by the employer) will be inclined to shade decisions in the employer's favor. *Firestone* held that the standards of trust law determine how judges review ERISA plans' decisions, and several decisions conclude that, as a matter of trust law, an administrator's conflict of interest justifies an intermediate standard of judicial review even when a plan's language gives discre-

tion to the administrator. See, e.g., *Killiam v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998).

This circuit has held otherwise, *Perlman v. Swiss Bank Corp.*, 195 F.3d 975 (7th Cir. 1999), for three principal reasons. First, *Firestone* makes the standard of review a matter of contract. By using particular language, the plan's sponsors can require deferential review. Trust law honors rather than overrides express contractual language specifying a trustee's powers vis-à-vis a beneficiary. See generally John H. Langbein, *The Contractarian Basis of the Law of Trusts*, 105 Yale L. J. 625 (1995). ERISA has some rules that displace contracts, but the degree of an administrator's fact-finding and interpretive discretion is not among the subjects on which the law supersedes private choice.

Second, one must not anthropomorphize "the administrator." Rarely is a pension or welfare plan's administrator a person whose own welfare is at stake. Administrators commonly are large organizations, and the real people who make decisions on its behalf are no more interested in the outcome than federal judges are "interested" in the resolution of a tax case. True, judges' salaries won't be paid if taxes can't be collected, but the effect of any one case on federal finances is so small that the judge does not care who prevails. Just so with the people who act on requests for pension or welfare benefits. Corporations often find it hard to align employees' incentives with stockholders' interests; they use stock options, bonuses, piece rates, and other devices. Administrators usually don't try. There would be a real conflict of interest if a given administrator put in place a method of linking decisionmakers' income to the substance of their deci-

sions. A quota system ("grant no more than 50% of all applications") or some other means of tying the wages or promotion of staff to its disposition of claims could call for non-deferential judicial review. But Williams has not argued that anyone who handled his claim had any personal interest in the outcome.

Third, even if the employer made the decision directly, its financial interest would not necessarily imply a thumb on the scale. Interpublic adopted this Plan to attract and retain good workers. If it chisels on those benefits in the course of implementation, that would undermine its reputation for treating workers well. Unless a firm is on the verge of bankruptcy, that reputational interest leads it to make honest decisions on applications for health and welfare benefits. See *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048 (7th Cir. 1987). Even though Campbell Mithun no longer has a Chicago office, employees in other cities may well learn whether the workers in Chicago have been treated well following the sale. Poor treatment of workers at a divested office would jeopardize Campbell Mithun's ongoing business.

The Supreme Court may decide this spring in *MetLife v. Glenn*, cert. granted, 128 S. Ct. 1117 (2008) (argued April 23, 2008), whether an administrator's financial conflict of interest affects the standard of judicial review. We need not hold this appeal for the outcome of *MetLife*, however, because Williams loses even under *de novo* review.

The Plan poses two questions. First, was Williams offered a comparable position? Second, was he offered a salary at least equal to his old one? The administrator gave affirmative answers to both questions, as did the district court. At Campbell Mithun, Williams supervised

client accounts and had other account executives under him. GreenHouse offered him the same role. He says that the position at GreenHouse would have been inferior because it planned to operate an independent agency in Chicago, while Campbell Mithun operates internationally (Williams says that he would have lost prestige as a result), and that GreenHouse works for smaller clients than Campbell Mithun does, but the district judge rightly responded that the question under the Plan is whether the *jobs* are comparable, not whether the employer is carrying over the operations unchanged. In *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822 (7th Cir. 2004), on which Williams principally relies, there was an effective demotion; not so here.

As for salary: $169,000 a year exceeds $167,000 a year. Williams wants us to look at the total value of his compensation package, including all fringe benefits, rather than at salary alone. But the Plan says "salary" rather than "compensation". It is possible to require a comparison of fringe benefits as well as salary; the plan in *Bowles v. Quantum Chemical Co.*, 266 F.3d 622, 628 (7th Cir. 2001), did just that. This Plan limits the comparison to salary, perhaps because the same package of fringe benefits has different values to different people. If an employer offers every executive two weeks at a beach bungalow, what is the benefit's value when the executive prefers to ski and thinks that beaches just produce skin cancer? Campbell Mithun offered Williams $300 a month toward the cost of parking, and GreenHouse offered only $100; but if Williams walked to work or took the train, these came to the same thing. We are willing to assume that Campbell Mithun's complete package of fringe benefits was substantially more valuable to Williams than

GreenHouse's; this may be why Williams quit. But that does not avoid the fact that the Plan specifies a lower salary, rather than a lower total compensation, as the trigger for severance benefits. Nor can Williams use the difference in fringe benefits to argue that his position at GreenHouse would not have been "comparable" to his position at Campbell Mithun: the Plan treats compensation separately from the comparability of the old and new jobs.

Our task, like the Plan's administrator, is to apply the Plan's actual language rather than the provision that Williams wishes the Plan had contained. A court can no more rewrite a severance-benefits plan to be more favorable to employees than it could direct GreenHouse to give its executives eight rather than four weeks of vacation. The severance plan's terms were among the fringe benefits that Campbell Mithun offered to its executives; Williams gets the full value of that offer, and no more.

AFFIRMED